UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| BLAKE HADDIX, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 5:15-31-DCR |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH MEKO, Warden, | ) | REPORT AND RECOMMENDATION |
| Little Sandy Correctional Complex, | ) | |
| | ) | |
| Respondent. | ) | |

*** *** *** ***

On February 10, 2015, Petitioner Blake Haddix, *pro se*, filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, asserting a claim of juror mendacity and various claims of ineffective assistance of counsel. (R. 1). On March 24, 2015, Respondent filed his Answer to the Petition, to which Haddix filed a Reply. (R. 4, 8). Having all relevant documents and records before the Court, the matter is now ripe for consideration and preparation of a Report and Recommendation. 28 U.S.C. § 636(b). For the reasons stated below, it will be herein **recommended** that Haddix's § 2254 Motion be **denied**.

I.      BACKGROUND

A.      Factual History of the Offense

The Kentucky Supreme Court recounted the case factual history as follows:[1]

On the evening of September 5, 2003, Estill Mullins and his father, Woodrow Mullins, were sitting on Estill's front porch in Breathitt County. Appellant Haddix, who had known Estill and Woodrow for some time, arrived on a four-wheeler to visit

---

[1]Factual findings made by state courts are entitled to a presumption of correctness that may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

with them.  As they talked, the three men drank beer.  After Woodrow came inside, Estill's wife, Gladys, went to the door and called Estill inside.  As Estill was closing the front door behind him, he was struck by a bullet that came through the window of the front door.  Estill fell to the floor, bleeding from a wound to the head.

Having heard the shot, Gladys headed for the back door so that she could leave and call the police.  As the Mullins's home had no phone, Gladys intended to drive a short distance to her sister's house.  Gladys heard two more shots as she drove away.

As Gladys was leaving, Woodrow grabbed a .410 gauge shotgun and went outside to confront Haddix.  Haddix shot Woodrow twice, with one round traveling from the chest to the neck and the other round entering the abdomen.

Officers arrived to find Woodrow lying dead on the front porch and Estill lying in the hallway bleeding from a head wound.  Officers also discovered Haddix lying in the driveway.  Haddix appeared to be very intoxicated and had one hand near the grip of a revolver sticking out of a pocket.  Haddix was taken into custody and a .32 caliber revolver was recovered.

Officers also recovered the .410 gauge shotgun that was found lying near Woodrow's body.  The shotgun had one live round in the chamber.  Testimony at the preliminary hearing indicated no spent shotgun shells were recovered from the scene.  Further, while officers were unable to recover the round that struck Estill, they did recover both of the rounds that struck Woodrow.  Ballistics tests indicated both rounds that struck Woodrow were fired from the .32 caliber revolver recovered from Haddix.

At trial, Haddix confirmed that he drove to the Mullins's residence on a four-wheeler, and that the men sat outside drinking beer.  However, Haddix claimed that the men argued over a timber cutting contract.  While Haddix denied shooting Estill, he claimed he shot Woodrow in self defense.  Haddix testified that Woodrow came out of the house with the shotgun and fired it.  As Woodrow was reloading, Haddix warned him not to continue.  When Woodrow aimed the shotgun at him, Haddix shot Woodrow.

(R. 1-1, at 2-3).

### B.    Procedural History

On October 21, 2003, a Breathitt County, Kentucky, grand jury returned an Indictment charging Haddix with the murder of Woodrow Mullins, the attempted murder of Estill Mullins, and resisting arrest.  (R. 4-3, at 1-2).  Haddix's jury trial commenced on September 26, 2006.  During the trial, upon the Commonwealth's motion, the trial court dismissed the charge of resisting arrest.

2

On September 29, 2006, the jury returned a verdict finding Haddix guilty on Count 1 of murder and on Count 2 of assault in the second degree.  (R. 4-3, 13-28).  The jury recommended a consecutive sentence of 40 years–a 35-year term of imprisonment on Count 1 and a 5-year term of imprisonment on Count 2.  (R. 4-3, at 29-35).  On February 23, 2007, Haddix appeared with counsel for sentencing, and the trial judge entered judgment and sentence consistent with the jury's recommendation.  (R. 4-3, at 37-40).

On direct appeal, Haddix argued he was entitled to a new trial because three jurors failed to disclose relevant facts in response to the juror qualification questionnaires and during voir dire.  The Kentucky Supreme Court vacated the judgment and sentence and remanded the case for an evidentiary hearing to determine whether Haddix's claims of juror misconduct were true and, if so, whether he was entitled to a new trial.  (R. 1-1).  The Breathitt Circuit Court held an evidentiary hearing and found the jury verdict was not undermined by the service of these jurors.  (R. 1-2).  Accordingly, the trial court reentered judgment, sentencing Haddix to a 35-year term of imprisonment for murder and a 5-year term for second degree assault for a consecutive sentence of 40 years.  (R. 1-2, at 5).  Haddix appealed the new judgment, arguing it was error for the circuit court not to grant him a new trial based on juror mendacity.  On October 29, 2009, the Kentucky Supreme Court found no error in the circuit court's decision and affirmed the judgment of the Breathitt Circuit Court.  (R. 1-4).

On May 6, 2010, Haddix filed a *pro se* Motion to Vacate, Set Aside or Amend Judgment and Sentence pursuant to Kentucky Rule of Criminal Procedure (RCr) 11.42 (R. 4-8, at 23-51).  On May 26, 2010, he filed a Supplement to his RCr 11.42 Motion.  (R. 4-9, at 23-33).  In these Motions Haddix alleged nine claims of ineffective assistance of counsel.  On May 27, 2010, the Breathitt Circuit Court denied his 11.42 Motion without a factual analysis, finding Haddix did not suffer

prejudice from any of the ineffective assistance of counsel allegations. (R. 1-3). Haddix, through counsel, appealed the denial of his 11.42 Motion.[2]

On January 27, 2012, the Kentucky Court of Appeals affirmed in part the Breathitt Circuit Court's decision on Haddix's 11.42 Motion, but reversed in part and remanded for evidentiary hearing the circuit court's decision on one claim of ineffective assistance of counsel. Specifically, the court remanded Haddix's claim that trial counsel provided ineffective assistance in failing to contact witnesses who could testify to victim Woodrow Mullins's reputation as a violent man.

On July 19, 2012, the Breathitt Circuit Court held an evidentiary hearing on Haddix's remaining claim. (R. 4-16). On August 27, 2012, after hearing testimony from seven witnesses as to Woodrow Mullins's propensity for violence decades before his death, the court denied the remaining claim, finding the evidence did not support that Haddix was prejudiced by counsel's failure to present this testimony. (R. 4-16, at 4-10). Haddix, through counsel, again appealed the Breathitt Circuit Court's denial of his RCr 11.42 Motion, challenging the findings as to his claim of ineffective assistance of counsel in failing to present testimony on Woodrow Mullins's propensity for violence. (R. 4-16, at 11-25).

On February 7, 2014, the Kentucky Court of Appeals affirmed the judgment of the Breathitt Circuit Court denying his RCr 11.42 Motion. (R. 1-7). The Kentucky Court of Appeals held that Haddix had not met his burden of establishing that counsel's trial strategy was deficient or that he was prejudiced by counsel's failure to present the testimony regarding the victim's alleged propensity

---

[2]While Haddix's appeal was pending, he filed two Motions to Vacate Judgement under Rule 60.02 and RCr 10.26. (R. 4-9, 30-33; R. 4-10, at 1-20). In these Motions, he sought to renew his 11.42 arguments stating he was entitled to findings and conclusions on the claims summarily dismissed. He also raised additional arguments, not previously raised, regarding errors involving the grand jury and selection of his trial jury. (R. 4-9, at 31-32; R. 4-10, at 1-27). The circuit court denied both Motions. (R. 1-5, at 1-3; R. 4-10, at 28). The January 27, 2012, decision of the Kentucky Court of Appeals references these Motions and states only the CR 60.02 Motion was appealed. (R. 1-6, at 2).

for violence, given the victim's age and frail condition and the strong case against Haddix. Haddix filed a Motion for Discretionary Review with the Kentucky Supreme Court, which was denied on September 10, 2014. (R. 4-17, at 37-41, 53).

On February 10, 2015, Haddix filed the present federal Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (R. 1). In his Petition, Haddix asserts one claim of juror mendacity and six claims of ineffective assistance of counsel. His claims of ineffective assistance of counsel are based on his allegations that counsel failed to: contact or call witnesses regarding the victim, Woodrow Mullins's, propensity for violence; prepare and present affirmative defenses; retain or consult an expert regarding Haddix's mental health; object to the erroneous comment of the prosecutor during closing argument that the victim was shot from behind; and seek a change of venue or have the jury sequestered. Haddix also asserts counsel provided ineffective assistance by introducing a 911 tape and a police log that were more prejudicial than probative.

## II.   ANALYSIS

### A.   Governing Legal Standard

Review of a state prisoner's petition for habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. The AEDPA sets forth the substantive standards for granting habeas relief by providing:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet,' *Harrington v. Richter*, 562 U.S. [86, 102] (2011), and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S. Ct. 1388, 1398 (2011) (*quoting Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). The petitioner carries the burden of proof. *Id.*

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (*quoting Williams*, 529 U.S. at 405-06).

Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court [may] 'grant the writ if the state court identifies the correct governing legal principal from [the Supreme] Court's decision but unreasonably applies that principal to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (*quoting Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. Thus, under the AEDPA, the question for this Court is "not whether a federal court believes the state court's determination was incorrect

6

but whether the determination was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 102-03. Further, factual findings of the state court are presumed correct unless the petitioner presents clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

### B.      Claims are not Procedurally Defaulted

Before this Court can grant a § 2254 petition, a prisoner filing a petition must first exhaust all available state remedies. *See* 28 U.S.C. § 2254(b)(1); *see also O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). To be deemed properly exhausted, each claim must have been fairly presented to the state courts. *See* 28 U.S.C. § 2254(b), (c); *O'Sullivan*, 526 U.S. at 845 ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); *Wagner v. Smith,* 581 F.3d 410, 414-15 (6th Cir. 2009); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990). "Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim." *Wagner*, 581 F.3d at 414-15. "Such a requirement affords state courts an opportunity to consider and correct any violation of federal law, thus expressing respect for our dual judicial system while also furnishing a complete record of a petitioner's federal claim as litigated in the state system, including the state court of last resort." *Hafley*, 902 F.2d at 482. "A federal court cannot grant

habeas relief if there still is a potential state remedy for the state courts to consider." *Wagner,* 581 F.3d at 415.

Here, Respondent states he believes all claims have been exhausted, but adds he is not waiving any defenses the Court may find available, including the failure to exhaust.  (R. 4, at 2). Haddix raised his claims of ineffective assistance of counsel in his RCr 11.42 Motion filed in the Breathitt Circuit Court (*see* R. 1-1; R. 4-8).  A review of Haddix's appellate brief on the Breathitt Circuit Court's denial of his post-conviction filings (*see* R. 4-11; R. 4-13) and the first appellate decision (*see* R. 1-6) reveals that he appealed only whether the circuit court erred in denying his claims without an evidentiary hearing–not whether the circuit court improperly determined his ineffective assistance of counsel claims.  (R. 1-6, at 3).  Haddix did, however, provide the factual and legal arguments for his claims in his appellate briefing.  (R. 4-11).

As both Haddix and Respondent point out, in discussing whether the trial court's denial without an evidentiary hearing was proper, the appellate court discussed the claims of ineffective assistance of counsel and affirmed the circuit court's denial of his RCr 11.42 Motion on all grounds except the claim regarding counsel's failure to call witnesses regarding the victim's propensity for violence, which it remanded for an evidentiary hearing.  (R. 1-6, at 14).  Thus, Haddix has fairly presented his claims to the Kentucky courts and his claims are not procedurally defaulted.  *See Nali v. Phillips*, 681 F.3d 837, 851-52 (6th Cir. 2012) (finding state court had opportunity to adjudicate ineffective of assistance claim on merits where state appellate court denied motion to remand for evidentiary hearing).

**C.     Haddix was not Denied his Right to be Tried by an Impartial Jury**

In the Petition, Haddix argues that the Kentucky Supreme Court unreasonably applied clearly established federal law when it affirmed the circuit court's denial of a new trial on the basis of juror

mendacity based on juror J.S.'s failure to disclose certain information during voir dire and on her juror qualification questionnaire.  (R. 1, at 6; R. 8, at 6-12).  Specifically, Haddix argues that juror J.S. failed to disclose: 1)  her family's involvement with the criminal justice system; 2) that her sister's husband was a first cousin of one of the victims; and 3) that she has memory problems due to multiple sclerosis.  (*Id.*).

The Sixth Circuit has explained the established federal law on this issue:

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ."  U.S. CONST. amend. VI.  In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court recognized that the jury selection process "serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors," and that the "necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."  464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed.2d 663 (1984).  "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  *Id*. at 555, 104 S. Ct. 845.

Declaring that a litigant is "entitled to a fair trial but not a perfect one," *id*. at 553, 104 S. Ct. 845, the *McDonough* Court held that a defendant who discovers that a juror has withheld material information is entitled to a new trial only if the juror's failure to disclose denied the defendant his right to an impartial jury.  *Id*. at 556, 104 S. Ct. 845.  In order to obtain a new trial based on a juror's non-disclosure during voir dire, the defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."  *Id*.

Challenges for cause allow the removal of panel members only "on a narrowly specified, provable and legally cognizable basis of partiality," *Swain v. Alabama*, 380 U.S. 202, 220, 85 S. Ct. 824, 13 L. Ed.2d 759 (1965), *overruled on separate grounds by Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed.2d 69 (1986), "such as a personal relationship with a party, witness, or attorney in the litigation, or a biased state of mind concerning a party or issue in the case."  *United States v. Annigoni*, 96 F.3d 1132, 1138 (9th Cir. 1996), *overruled on separate grounds by Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed.2d 320 (2009).  A finding of bias is thus central to the *McDonough* test:  "Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause."  *McDonough*, 464 U.S. at 554, 104 S. Ct. 845.

> The *McDonough* standard applies in cases where a juror deliberately conceals information as well as in cases of "mistaken but honest" responses to voir dire questions. *Id*. at 555, 104 S. Ct. 845. Only when a juror is found to have deliberately concealed material information, however, may bias be inferred. If information is not concealed deliberately, "the movant must show actual bias." *See, e.g., Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995) (emphasis omitted). "Actual bias is 'bias in fact' and focuses on the record at voir dire." *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005).

*English v. Berghuis*, 529 F. App'x 734, at 739-40 (6th Cir. 2013). In determining whether a juror is biased, the question "is plainly one of historical fact," which is presumed to be correct unless rebutted by clear and convincing evidence. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984); *English*, 529 F. App'x at 739 (*citing Wainwright v. Witt*, 469 U.S. 412, 426 (1985)); *see also* 28 U.S.C. § 2254(e)(1).

Haddix first raised this claim in the state court on direct appeal, and the Kentucky Supreme Court remanded the issue for an evidentiary hearing.[3] (R. 1-1). After an evidentiary hearing on the issue, the Breathitt Circuit Court held that the jury verdict was not undermined by J.S.'s service as a juror. (R. 1-2). Specifically, the circuit court found that: J.S. was not aware at the time of trial that her brother-in-law was related to the victims; her past filing of a criminal complaint did not undermine the integrity of the verdict; and her health did not effect her ability to listen to the testimony and make a decision based on the evidence. (*Id*.). The Breathitt Circuit Court denied Haddix's Motion for a New Trial, and reentered Judgment against him, imposing a 40-year term of imprisonment. (*Id*.).

On appeal, the Kentucky Supreme Court affirmed the Judgment of the Breathitt Circuit Court. (R. 1-4). In its decision, the Court explained:

---

[3]Haddix first argued on direct appeal that three jurors had failed to disclose important information on the juror questionnaire or in voir dire. However, only the issues surrounding juror J.S. are raised in the pending Petition.

> [T]o be entitled to a new trial as a result of juror mendacity during voir dire, a defendant must show (1) that a material question was asked, (2) that the juror answered the question dishonestly, and (3) that a truthful answer would have subjected the juror to being stricken for cause. *Taylor v. Commonwealth*, 175 S.W.3d 68, 74-75 (Ky. 2005). A juror should be stricken for cause "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence." RCr 9.36(1).

(R. 1-4, at 3).

That the Kentucky Supreme Court did not cite United States Supreme Court precedent does not affect this Court's review under the deference of the AEDPA. A state court need not cite, or even be aware of, Supreme Court precedent, so long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Here, while the Kentucky Supreme Court did not specifically cite to Supreme Court precedent, it correctly set forth the standard to apply in determining if a new trial is required as a result of juror mendacity.[4] *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) (the controlling Supreme Court precedent on the issue). While Haddix argues that the Kentucky Supreme Court erred in not recognizing that *McDonough* applies to cases where a juror gives a mistaken but honest response, as explained below, the state court did apply the *McDonough* framework to the issues he raised regarding juror J.S. Accordingly, the Kentucky Supreme Court's decision was not contrary to clearly established federal law as determined by the Supreme Court of the United States. Thus, the issue becomes whether the Kentucky Supreme Court unreasonably applied *McDonough* to the facts of this case.

As discussed above, in order for a state court's application of law to be unreasonable, it must be more than merely erroneous or incorrect, it must be objectively unreasonable. *Wiggins*, 539 U.S.

---

[4]The Kentucky Supreme Court cited to its own decision in *Taylor*, 175 S.W.3d at 74-75, which in turn cited to *Adkins v. Commonwealth*, 96 S.W.3d 779, 796 (Ky. 2003), which cited to *McDonough*, 464 U.S. at 556.

at 520*; Villagarcia v. Warden, Noble Correctional Inst.*, 599 F.3d 529, 533 (6th Cir. 2010) (*quoting Williams*, 529 U.S. at 411)).  "The threshold for 'unreasonableness' is 'substantially higher' than it is for incorrectness, . . . satisfied only when a state-court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Thurmond v. Carlton*, 489 F. App'x 834, 836-37 (6th Cir. 2012) (*quoting Landrigan*, 550 U.S. at 473; *Richter*, 562 U.S. at 103).  Thus, "even if this court 'believe[s] that a state court incorrectly applied federal law, [it] must refuse to issue the writ of habeas corpus if [it] finds that the state court's decision was a reasonable one.'"  *Villagarcia*, 599 F.3d at 533 (*quoting Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000)).

Here, the Kentucky Supreme Court reviewed the record and found that the Breathitt Circuit Court's factual findings, after an evidentiary hearing, were not clearly erroneous, and it affirmed the circuit court's judgment.  (R. 1-4).  The Kentucky Supreme Court found that while juror J.S. was asked material questions regarding whether she or a family member had ever been involved in a criminal matter and whether she was related by blood or marriage to either victim, it was not clear that she had answered either question dishonestly.  At the state evidentiary hearing, J.S. testified that she did not know a man named Greg Carnes, but when shown a criminal complaint against him with her signature as the complainant, she explained she did not recall his name until shown the complaint and then testified that the situation involved a threat against her sister.  (R. 7, DVD of evidentiary hearing on 10/3/2008, at 9:34 - 9:42).  While J.S. also testified that she may have called the police on her husband and maybe a neighbor, she could not recall if either incident resulted in a criminal complaint.  (*Id.*)  J.S. also recalled that her grandfather, uncle, and cousin had been either defendants or victims in criminal matters in the past, but she said she did not mention these incidents in response

to the question because she thought the question related only to immediate family members. (*Id*. at 9:45 - 9:53).

The Kentucky Supreme Court found that it did not appear J.S. had deliberately concealed any information regarding her or her family members' involvement with the criminal justice system. (R. 1-4, at 5-6). Instead, the Kentucky Supreme Court noted that J.S. testified she thought the question regarding whether her family had any prior involvement with the criminal justice system referred only to her immediate family, and the court found she may not have remembered the incident involving Mr. Carnes at the time she completed the juror qualification form. (*Id*. at 4-5). The Kentucky Supreme Court further found that even if J.S. had recalled the information and given a truthful answer, her answer would not have been a basis for striking her for cause. (*Id*. at 5-6). Moreover, the Kentucky Supreme Court found that there was no showing of bias caused by J.S.'s or her family members' involvement in the criminal justice system. (*Id*.).

Similarly, the Kentucky Supreme Court also found that the record did not establish that J.S. intentionally withheld information about her brother-in-law being related to the victim. (R. 1-4, at 6-7). The record supports this finding. (R. 7, DVD of state evidentiary hearing 10/3/08, at 9:53 - 9:58; 10:07:35; 10:10:31; 10:16:27). J.S. testified that she is not particularly close to her brother-in-law, and did not know at the time of trial that he was related to the victim Woodrow Mullins. She stated she knew the victims and her brother-in-law shared the same last name, but she did not think they were from the same family because they did not look alike. She also testified that she did not learn of a potential relationship between Woodrow and her brother-in-law until after the trial. (*Id*. at 9:53 - 9:57).

As the United States Supreme Court has held, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness

of a trial." *McDonough*, 464 U.S. at 556.  In cases where a juror's failure to respond to voir dire questioning is the result of an honest mistake, a showing of actual juror bias is required before a new trial must be granted.  *Zerka*, 49 F.3d at 1186.  Here, the Kentucky Supreme Court found there was nothing in the record or in the Breathitt Circuit Court's findings of fact to suggest J.S. was biased. The question of bias of an individual juror at a state criminal trial is a question of historical fact and thus is presumed correct unless rebutted by clear and convincing evidence.  *See Patton*, 467 U.S. at 1036; *see also* 28 U.S.C. § 2254(e)(1).  Haddix has not met his burden and has not shown that the Kentucky court's finding that J.S. was neither dishonest or biased was an unreasonable application of established federal law.[5]

Similarly, Haddix's argument also fails to the extent he argues that the Kentucky Supreme Court's decision was contrary to or an unreasonable application of established federal law where it affirmed the Breathitt Circuit Court's denial of his motion for new trial despite J.S.'s failure to disclose her multiple sclerosis.  During voir dire, the jury pool was asked whether any of them had any health problems that precluded them from sitting on a four-day trial.  J.S. remained silent and did not reveal her multiple sclerosis.  In addition, the jury qualification questionnaire asked her to check a box if she was seeking to be permanently excused from jury service as a result of her health, but J.S. did not check the box.[6]  Haddix argues that J.S.'s failure to disclose her multiple sclerosis

___

[5]Haddix points to J.S. and her sister and brother-in-law being long-time neighbors as rebutting the court's finding that J.S. did not intentionally conceal her brother-in-law's relationship to the victim.  A review of J.S.'s testimony at the evidentiary hearing demonstrates that Haddix's attempt to rebut the state court's factual finding is insufficient.  J.S. was clear that she did not know at the time of the trial that her brother-in-law was related to the victim.  The fact that she and her brother-in-law were neighbors is not clear and convincing evidence that she did, in fact, know of his relationship to Woodrow Mullins at the time of trial.

[6]The Kentucky Supreme Court noted that the juror qualification form had a section stating "I ask to be PERMANENTLY EXCUSED from jury service due to a PERMANENT MEDICAL CONDITION." (R. 1-4, at 8).  J.S. did not check the box next to this statement.

14

and associated problems with her memory in response to either of these questions was a deliberate concealment, sufficient to show bias, and thus required a new trial under *McDonough*.

First, to the extent Haddix may suggest that J.S.'s multiple sclerosis caused significant impairment to her short-term memory, he has not pointed to any evidence demonstrating this fact. Instead, a review of the record supports the state court's findings that J.S.'s health did not render her unable to serve as a juror.  At the evidentiary hearing, J.S. revealed for the first time that she has multiple sclerosis, but she also testified that she was able to listen to the evidence and rendered a decision based on the evidence.  (R. 7, DVD of 10/3/08 evidentiary hearing, at 10:11-10:18).  While she stated she sometimes has problems with her short-term memory, her further testimony indicated that she only had trouble recalling names, numbers and specific information when put on the spot. (*Id*. at 9:40 - 9:45; 9:58; 10:08).  She testified that when she is put on the spot, she has to sit and think to come up with specific information.  J.S. clarified more than once that she did not know if the difficulty she has with her memory was a result of aging or her illness.

In addition, the Court notes that during the evidentiary hearing, J.S was able to provide responses to counsel's questions and she was able to recall historical information regarding herself and her family, the trial, testimony presented at trial, as well as jury deliberations.  While she may not have recognized Mr. Carnes's name immediately upon hearing it, after seeing the criminal complaint, she recalled who he was and explained that the incident described in the complaint involved her sister.  Haddix has not demonstrated that J.S. had any significant memory problem that would preclude her from sitting on the jury, and her participation at the evidentiary hearing did not

evidence any impairment in this regard.[7]  Thus, the record supports the state court's findings that J.S.'s health did not render her unable to serve as a juror.

To the extent Haddix argues that the Kentucky Supreme Court erred in not considering J.S.'s failure to disclose her multiple sclerosis during jury selection under the *McDonough* framework, he is incorrect.  The Kentucky Supreme Court determined that it was not clear that J.S. had been asked a material question regarding her multiple sclerosis.  Instead, the court found that she was given an option to check a box seeking to be permanently excused for a medical condition and was asked whether she had a health condition that prevented her from sitting for a four-day trial.  The Kentucky Supreme Court found J.S. may have assumed her multiple sclerosis did not qualify to be permanently excused, and noted that she did, in fact, sit for the four-day trial.  Thus, the court found that even if it were to find J.S. was asked material questions about her multiple sclerosis, her failure to disclose her medical condition in response was not dishonest, i.e. it was not a deliberate concealment.  This analysis is consistent with the first two inquiries of the *McDonough* framework.

Further, the Kentucky Supreme Court addressed the final inquiry of the *McDonough* analysis.  It found Haddix had not established that J.S.'s health would have been a basis for excusing her for cause, citing Kentucky case law requiring a showing of prejudice before finding a trial court erred in not excusing a juror for cause based on a juror's less than perfect ability to assimilate or evaluate testimony and evidence.  R. 1-4, at 9 (*citing Woodard v. Commonwealth*, 147 S.W.3d 63, 69 (Ky. 2004) (*quoting United States v. Dempsey*, 830 F.2d 1084, 1088 (10th Cir. 1987)).  Despite Haddix's argument to the contrary, the Kentucky court's citation to *Woodard* and *Dempsey* was not contrary

---

[7]To the extent Haddix references J.S.'s statement that she is "psychic" as evidence that she was somehow unfit to serve as a juror, *see* R.8, at 8, the record belies the suggestion.  Instead, it is evident from the exchange between counsel and J.S. that J.S.'s statement was not meant in earnest, but was a sarcastic response to counsel's repeated questions on how she knew he was going to ask her a question about her address.  (*See* R. 7, DVD of 10/3/08 state evidentiary hearing, at 9:36 - 9:38).

to or an unreasonable application of *McDonough*.  Instead, the Kentucky Supreme Court's citation

to these cases was for the purpose of demonstrating why Haddix could not establish J.S.'s multiple

sclerosis, had it been known, was a valid basis for a challenge for cause as required to meet the

*McDonough* framework.

Accordingly, the decision of the Kentucky Supreme Court on this issue was neither contrary

to federal law nor an unreasonable application of United States Supreme Court precedent. The

Kentucky Supreme Court properly reviewed Haddix's claims of juror mendacity under the prevailing

federal standard, and it reasonably concluded that a new trial was not required.

### D.    Claims of Ineffective Assistance of Counsel Lack Merit

In his § 2254 Petition, Haddix asserts that he was denied his Sixth Amendment right to the

effective assistance of counsel by counsel's:  1) failure to contact or call witnesses regarding the

victim's propensity for violence; 2) failure to prepare and present affirmative defenses and seek

instructions for lesser included offenses; 3) failure to retain or consult an expert regarding Haddix's

mental health; 4) failure to object to the erroneous comment of the prosecutor that the victim was

shot from behind; 5) failure to seek a change of venue or to have the jury sequestered; and 6) conduct

of introducing a 911 tape and a police log that were more prejudicial to Haddix than beneficial.

To prevail on an ineffective assistance of counsel claim, a petitioner must meet both prongs

of the two-part test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687

(1984).  Specifically, a petitioner must show that counsel's performance was deficient and that the

deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.

*Id*.  A reviewing court's scrutiny of counsel's performance is highly deferential.  *Id*. at 694.  To

demonstrate deficient performance, a petitioner must show that his counsel's representation fell

below an objective standard of reasonableness on the facts of the particular case, viewed as of the

time of counsel's conduct. *Id*. at 688-89, 693-94. "The [petitioner's] burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Richter*, 562 U.S. at 104 (*citing Strickland*, 366 U.S. at 687). "To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 366 U.S. at 694. A finding of no prejudice provides an adequate ground for rejecting an ineffective assistance of counsel claim, even if a deficient performance is assumed. *Id*. at 687.

Under federal law, this Court has the power to grant Haddix's Petition only if the decision of the Kentucky courts "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Here, the Kentucky courts correctly identified *Strickland* as the controlling legal authority for considering claims of ineffective assistance of counsel. (R. 1-6, at 3; R. 1-7, at 6). Thus, the issue becomes whether the Kentucky courts unreasonably applied *Strickland* to the facts of this case.

In order for a state court's application of law to be unreasonable, it must be more than merely erroneous or incorrect, it must be objectively unreasonable. *Wiggins*, 539 U.S. at 520; *Villagarcia*, 599 F.3d at 533 (*quoting Williams*, 529 U.S. at 411)). "The threshold for 'unreasonableness' is 'substantially higher' than it is for incorrectness, . . . satisfied only when a state-court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Thurmond*, 489 F. App'x at 836-37 (*quoting Landrigan*, 550 U.S. at 473; *Richter*, 562 U.S. at 103). Thus, "even if this court 'believe[s] that a

state court incorrectly applied federal law, [it] must refuse to issue the writ of habeas corpus if [it] finds that the state court's decision was a reasonable one.'" *Villagarcia*, 599 F.3d at 533 (*quoting Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000)).

As discussed below, the Kentucky courts reasonably applied *Strickland* to each of Haddix's claims of ineffective assistance of counsel, and therefore his claims lack merit.

### 1.     Claim that counsel was ineffective for failing to call witnesses regarding the victim's propensity for violence

Haddix argues that the Kentucky Court of Appeals unreasonably applied *Strickland* in finding trial counsel's failure to call witnesses to testify as to Woodrow Mullins's reputation and propensity for violence did not constitute the ineffective assistance of counsel. (R. 1, at 8; R. 8, 14-18). Haddix argues that had counsel called witnesses to testify in this regard, it would have bolstered his claim of self defense and corroborated his testimony, thus rendering his testimony more credible to the jury.

Haddix first raised this issue in his May 6, 2010, RCr 11.42 Motion, which the Breathitt Circuit Court denied on May 27, 2010, without an evidentiary hearing. (R. 4-8, at 47-49; R. 1-3). The Kentucky Court of Appeals reversed the trial court's decision on this claim, and remanded for an evidentiary hearing. (R. 1-6, at 11-12). The circuit court held an evidentiary hearing on July 19, 2012, where defendant, through counsel, called seven witnesses to testify as to Woodrow's reputation for violence. Trial counsel was not called as a witness at the evidentiary hearing. (R. 1-7, at 4). The circuit court denied the claim of ineffective assistance, finding no showing of prejudice. (R. 4-16, at 4-9). In affirming the trial court's decision, the Kentucky Court of Appeals found Haddix had failed to establish either prong of *Strickland*:

> The circuit court conducted a hearing on July 19, 2012. Numerous witnesses were
> called to testify regarding their knowledge of Woodrow's character and propensity

for violence. The majority of the testimony regarding Woodrow indicated that they had knowledge of his violent propensities from forty years prior, when Woodrow was a younger man. At the time of his death, Woodrow was eighty-six years old, approximately five feet and three inches tall, and weighed 103 pounds. It is noteworthy to mention that Haddix did not seek the testimony of his trial counsel. The circuit court, in an order entered August 27, 2012, ruled that the testimony presented at the hearing did not establish the requisite elements of ineffective assistance of counsel. We agree.

. . .

In this case, Haddix must establish that his trial counsel's failure to call the witnesses presented at the hearing fell outside the wide range of professionally competent assistance, and, had the testimony been presented, the result of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).

As mentioned above, Haddix bears the burden of proof in this proceeding. Despite this burden, Haddix presented no testimony regarding his trial counsel's strategy. When this court remanded for a hearing, it was for the express purpose of determining trial counsel's strategy. Specifically, we instructed that the record was silent as to why the attorney did not present evidence regarding Woodrow's propensity for violence and noted, "[t]here are several possible explanations: perhaps the attorney felt disparaging the decedent would backfire and turn the jury against Haddix. Perhaps the witnesses Haddix wished to call could present only inadmissible testimony or were not credible. On the other hand, it is possible that the trial attorney simply neglected to investigate this matter thoroughly or was mistaken about the law governing such evidence, and therefore his performance was deficient." *Haddix v. Com*., Appeal No. 2010-CA-001190-ME and 2011-CA-00191-MR. This inquiry is in keeping with the analysis set forth in *Strickland*, where the United States Supreme Court instructed "that a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to the counsel's judgment." *Strickland*, 466 U.S. at 691.

Based on the testimony presented during the hearing, we cannot determine the trial strategy utilized by Haddix's trial counsel at trial was deficient. As a result, Haddix failed to overcome the presumption of reasonableness of the professional assistance by counsel at trial. *Com. v. Pelfrey*, 998 S.W.2d 460 (Ky. 1999). Additionally, we must note that Haddix's brief on appeal fails to articulate how the evidence regarding the victim, if presented at trial, would have affected the outcome. Given the age and frail condition of the victim, coupled with the strong case presented against Haddix, makes it highly unlikely that the outcome of the trial would have been different if the testimony regarding the victim's alleged propensity for violence was presented. This is especially true when one considers that Haddix testified at trial as to his version

of the facts and the jury chose not to believe him.  Accordingly, Haddix has failed to
meet his burden of establishing that counsel was deficient at trial.

(R. 1-7, at 4-5).

In reviewing the Kentucky Court of Appeal's decision, "[t]he pivotal question is whether the
state court's application of the *Strickland* standard was unreasonable.  This is different from asking
whether defense counsel's performance fell below *Strickland's* standard."  *Richter*, 562 U.S. at 101.
*Strickland* requires a court considering counsel's performance to "indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable professional assistance; that is, the
defendant must overcome the presumption that, under the circumstances, the challenged action might
be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.

Here, the Kentucky Court of Appeals found that "based on the testimony presented during
the hearing, we cannot determine the trial strategy utilized by Haddix's trial counsel at trial was
deficient."  (R. 1-7, at 5).  The Kentucky Court of Appeals noted that Haddix failed to present any
testimony regarding his counsel's strategy–neither trial counsel nor Haddix were called as a witness
at the evidentiary hearing.  The Kentucky Court of Appeals found that based on the testimony
presented at the evidentiary hearing, Haddix had failed to overcome the presumption that counsel
provided reasonable assistance at trial as it could not determine based on the testimony presented that
counsel's strategy was deficient.  The testimony at the hearing regarding Woodrow's reputation was
based on the witnesses' knowledge of his violent propensities from several decades before his death.
Moreover, no witness provided testimony about his reputation for violence on the date of his death.
Given these circumstances, the Kentucky Court of Appeals reasonably applied *Strickland* when it
held Haddix had not overcome the presumption that counsel's decision not to present witnesses to

testify to their knowledge of Woodrow's reputation approximately forty years earlier was sound trial strategy.

Further, other evidence also supports the Kentucky Court of Appeal's finding that counsel was not deficient in this regard.  *See Richter*, 562 U.S. at 103-03 ("a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision"). Evidence revealed that counsel had, in fact, subpoenaed a witness to testify to Woodrow's reputation, but chose not to call him.  Dwight Ritchie testified at the evidentiary hearing that he had been married to Woodrow's granddaughter for four or five months in the early 1990s and had heard stories about Woodrow being mean in his younger days.  (R. 7, DVD of 7/19/12 evidentiary hearing, at 9:34 - 9:49).  However, Mr. Ritchie also testified that Woodrow was always good to him, and he never witnessed any episodes of violence from Woodrow.  (*Id*.).  Given this testimony, it was not unreasonable for counsel to decide not to call Mr. Ritchie since his testimony would not have been particularly probative of Woodrow's propensity for violence in 2003, and, in fact, was to the contrary–Woodrow had always been good to Mr. Ritchie and he had not witnessed any acts of violence by him.

Moreover, Haddix testified at trial that he had known Woodrow and Estill Mullins all his life, and he thought he had a good relationship with both of them.  (R. 7, DVD of trial on 9/28/06, at 1:12:00 - 1:14; 134 - 1:35; 1:38).  Haddix testified that prior to the shooting he had never had an "ill word" with Woodrow and testified that he loved him.  (*Id*. at 1:14; 1:38).  Thus, given this testimony, it was not unreasonable for counsel to decide not to call a witness to testify to Woodrow's reputation for violence as a young man because it was evident from Haddix's own testimony that any reputation Woodrow may have had as a younger man in the community did not cause Haddix to fear him.  Instead, Haddix's claim of self defense was based on his testimony that he heard a gunshot,

turned around and saw Woodrow reload a shotgun, cock it, and then begin to lower the gun while aiming it at Haddix. Accordingly, the Kentucky Court of Appeals did not unreasonably apply *Strickland* when it found Haddix had not established that counsel's failure to call witnesses to testify as to Woodrow's reputation for violence based on events occurring several decades prior to his death constituted deficient performance.

In addition to finding counsel's performance in failing to call witnesses to testify to Woodrow's reputation of violence was not deficient under *Strickland*, the Kentucky Court of Appeals also found that Haddix failed to establish he was prejudiced by counsel's decision. (R. 1-17, at 8). Haddix has not demonstrated that the Kentucky Court of Appeals' finding with respect to the prejudice prong was an unreasonable application of *Strickland*. As explained above, to establish prejudice Haddix must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Thus, Haddix is required to show a "'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (*quoting Richter*, 562 U.S. at 112).

Here, there is not a substantial likelihood that had the jury heard testimony of Woodrow's reputation for violence some decades earlier that they would have returned a different result. Instead, Haddix's testimony indicated that he did not fear Woodrow prior to the events of that evening. Haddix testified at trial that he loved Woodrow and had a good relationship with him. (*Id*. at 1:13 - 1:14:30, 1:388 - 1:38). Haddix had voluntarily gone to the victims' home, drank beer and socialized with them for hours, and, in fact, testified that he thought it was strange that Woodrow had become hostile. (DVD of trial on 9/28/06, at 1:35:30 - 1:37). Despite Haddix's argument to the contrary, the testimony of the witnesses at the evidentiary hearing that they had heard approximately forty

years earlier that Woodrow was a violent man was not corroboration of Haddix's testimony.  To the

contrary, Haddix testified that he shot Woodrow only after Woodrow refused to put down the loaded

shotgun and continued to lower it while aiming it at him.

Haddix, Estill and Estill's wife Gladys were the only survivors from the scene and each

testified at trial to the events of the evening.  (*Id.*, DVD of trial on 9/28/06, at 1:07:26 - 1:57; trial

on 9/26/2006, at 3:12-41 - 4:14; trial on 9/27/06, at 9:17:24 - 10:04).  Estill and Gladys testified that

Haddix unexpectedly arrived at their home while Estill and Woodrow were sitting on their front

porch.  Haddix stayed several hours drinking beer and socializing.  Gladys testified that at some

point Woodrow went to bed, explaining that his bed was behind the couch in the main room of the

trailer.  She testified that Woodrow went back outside and told Haddix to leave, and then Woodrow

came into her bedroom and asked her to go call the police.  (R. 7, DVD of trial on 9/26/2006, at 3:32

- 3:37, 4:03 - 4:05:30, 4:12).  Gladys stated that she declined to call the police, but told Woodrow

she would go see what she could do.  *Id.*  Gladys testified that she went to the front porch, told Estill

it was getting late and it was time for him to come in the house and for Haddix to go home.  (*Id.*)

She testified that she last saw Haddix standing by his four-wheeler next to the front porch.  (*Id.* at

3:36 - 3:38).  She also stated that after she, Estill and Woodrow were all in the trailer and Estill had

closed the front door, she heard a gunshot.  (*Id.* at 3:36 - 3:44, 3:51, 4:13 - 4:14).  She testified that

upon hearing the gunshot she returned to the area near the front door, and she saw Estill had been

shot and was lying on the floor.  (*Id.* at 3:36 - 3:44).  A bullet hole was in the glass of the door, which

had not been there prior to that evening.  (*Id.* at 4:12).  She grabbed her car keys and ran out the back

door to get help because they did not have a phone, and as she got to her car, she heard a second shot

and then a third.  (*Id.* at 3:33 - 3:44).  She testified she thought the third shot was for her.  (*Id.*).

Gladys testified that the last time she saw Woodrow alive, he was standing in front of his bed in the main room of the trailer after Estill had been shot. (*Id*. at 3:51, 4:13 - 4:14).

While Estill could not recall anything after he was shot, he testified that Woodrow was on the porch visiting with him and Haddix awhile, but at some point Woodrow went in the house for the night. (DVD of trial on 9/27/06, at 9:21 - 9:23). Estill recalled that he also went inside because it was getting late, and he was shot as he was shutting the door. (*Id*. at 9:21 - 9:27). Estill testified that prior to the shooting no ill words had been exchanged between Haddix and anyone else at the house. (*Id*. at 9:31). He also testified he did not hear any gunshots before he was shot. (*Id*. at 10:03).

The jury heard the testimony of the witnesses and chose not to believe Haddix's version of events. Haddix has not established a reasonable probability that the outcome of the trial would have been different had the jury heard testimony of Woodrow's reputation for violence some forty years prior to his death.[8] This is especially true given Haddix's testimony regarding his close relationship with Woodrow and Estill, and Gladys's and Estill's testimony that the first gunshot came through the front door and injured Estill as he was closing it and that at the time of the first shot only Haddix was outside. Accordingly, the state court's conclusion that Haddix failed to meet his burden of establishing either prong of *Strickland* with regard to this claim is not contrary to, or an unreasonable application of, clearly established law, and this claim lacks merit.

---

[8]Haddix's citation to Sixth Circuit cases granting ineffective assistance of counsel claims where counsel failed to present any alibi witnesses to support a defendant's alibi testimony does not compel a different result. (*See* R. 8, at 16 (*citing Stewart v. Wolfenbarger*, 468 F.3d 338, 359 (6th Cir. 2006) and *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004)). Here, as explained above, the witnesses' testimonies at the evidentiary hearing would not have provided corroboration of Haddix's testimony, who testified he and Woodrow had never had an ill-word, and he thought it strange that Woodrow became hostile. (R. 7, DVD of trial on 9/28/06, at 1:35:30 - 1:37).

##### 2.    Claim that counsel provided ineffective assistance in preparing and presenting affirmative defenses

Haddix asserts that the Kentucky courts unreasonably applied clearly established law when denying his ineffective assistance of counsel claim relating to counsel's preparation and presentation on several affirmative defenses. (R. 1, at 9; R. 8, at 19-22). Specifically, Haddix asserts that his argument is two fold: 1) counsel failed to adequately marshal evidence to support the affirmative defenses; and 2) counsel failed to prepare jury instructions regarding the affirmative defenses and lesser included offenses. (*Id.*).

Haddix first raised this claim of ineffective assistance of counsel in his original RCr 11.42 Motion. (R. 4-8, at 32-38). A review of the briefing on his RCr 11.42 Motion as well as his appellate brief reveals that despite his argument to the contrary here, his presentation to the state courts was that counsel failed to seek the proper jury instructions for intoxication, extreme emotional disturbance (EED), as well as all lesser included offenses. (R. 4-8, at 32-38; R. 4-11, at 10-13). The Kentucky Court of Appeals considered the issue in Haddix's initial appeal of the circuit court's denial, without an evidentiary hearing, of his RCr 11.42 Motion:

> Haddix next contends his trial counsel was ineffective in failing to adequately prepare for and seek additional jury instructions on several affirmative defenses and lesser-included offenses. We are not persuaded.
>
> "Kentucky courts are bound to instruct juries on the whole law of the case, . . . including alternative instructions when supported by the evidence. . . ." *Morrow v. Commonwealth*, 286 S.W.3d 206, 213 (Ky. 2009) (internal citations omitted). A defendant may suffer ineffective assistance of counsel if his trial counsel fails to secure or attempt to secure appropriate jury instructions. *See Hatcher v. Commonwealth*, 310 S.W.3d 691, 699 (Ky. App. 2010), as modified (Apr. 23, 2010). On the other hand, courts have no duty to instruct the jury on theories which are not supported by the evidence. *Sanders v. Commonwealth*, 301 S.W.3d 497, 500 (Ky. 2010) (*citing Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky. 1983)). A defense counsel is not ineffective if he fails to urge an instruction that is not supported by the evidence.

Haddix argues his trial attorney should have sought a jury instruction on voluntary intoxication. Voluntary intoxication is a defense to the intent element of murder, and is available when "there is evidence that the defendant was so drunk that he did not know what he was doing, or when the intoxication negatives the existence of an element of the offense." *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002) (footnotes, citations, and quotation marks omitted). However, "mere drunkenness does not equate with the Kentucky Penal Code's definition of the "defense" of voluntary intoxication. . . ." *Id.* "If a jury is instructed on voluntary intoxication as a defense to Intentional Murder or First–Degree Manslaughter, it must also be instructed on Second–Degree Manslaughter as a lesser included offense[.]" *Nichols v. Commonwealth*, 142 S.W.3d 683, 689 (Ky. 2004).

We are perplexed by Haddix's argument because our review of the record reveals the jury was instructed on voluntary intoxication and second-degree manslaughter.[9]  In the definitions provided to the jury, the term WANTONLY is defined by the following passage:

A person acts wantonly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.  The risk must be of such nature or degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.  A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.
(Trial record, p. 162) (Emphasis added).

The record therefore refuted Haddix's claim that his trial attorney had failed to secure an instruction on voluntary intoxication, and no hearing was necessary on the matter.[10]

Haddix also protests that his trial attorney failed to seek an instruction on extreme emotional disturbance (EED).  The defense of extreme emotional disturbance has been described as follows:

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes.  It is not a mental disease in itself, and an enraged, inflamed, or

---

[9]The factual statement in *Haddix v. Commonwealth*, No. 2007–SC–000214–MR, 2008 WL 3890352 (Ky. Aug. 21, 2008) says: "Officers ... discovered Haddix lying in the driveway. Haddix appeared to be very intoxicated[.]"  Nothing in the record suggests anything more; specifically, the record does not support Haddix's representation that police officers found him "passed out" at the scene from alcohol intoxication.

[10]If Haddix is concerned with the adequacy of this instruction, he does not say so in his brief.

disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468–69 (Ky.1986).

It is Haddix's position on appeal, and was his testimony at trial, that just prior to the shootings, he and Estill Mullins had engaged in an argument regarding a potential job opportunity for Estill.  It was also his position at trial, however, that he had shot Woodrow only in self-defense and had no idea how Estill had been shot.  There was no factual basis to support an instruction on EED.

Indeed, in Haddix's version of events, he had remained calm even as members of the Mullins family leveled threats toward Haddix's family and Woodrow fired a shot at Haddix.  Haddix's own testimony belies the position he takes on appeal, and that is apparent from the record.  The circuit court had no need to conduct any additional inquiry on the matter.

Next, Haddix argues his trial counsel unreasonably failed to seek an instruction on fourth-degree assault because, as he puts it, "Estill Mullins walked out of the emergency room the same evening as the incident. . . ." (Appellant's brief, p. 12). He provides no further rationale or argument for this position and, indeed, does not state why he believes Estill's recovery has any bearing on the appropriate jury instruction.  We would have to speculate that Haddix believes Estill's speedy recovery indicates he suffered only "physical injury," as opposed to "serious physical injury," justifying an instruction on assault in the fourth degree.  However, we will not formulate arguments the parties themselves have not presented.  *See Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005).  Haddix has presented no reason to disturb the circuit court's ruling on this matter.

Finally, Haddix argues his trial attorney failed to secure jury instructions on "all degrees of murder."  The jury in Haddix's case was instructed on murder, manslaughter in the first degree, manslaughter in the second degree, and reckless homicide.  There was also a self-protection instruction.  Haddix's brief does not give any specific basis for his position, and once again fails to provide any supporting rationale.  We will not reverse the circuit court's order on this basis.

(R. 1-6, at 7-11).  In his Reply, Haddix argues that the Kentucky Court of Appeals incorrectly saw this claim as simply a jury instruction issue and dismissed it upon finding that the trial court had given the proper instructions.  (R. 8, at 20-22).

With respect to his claim regarding intoxication, Haddix admits in his Reply that the trial court gave the voluntary intoxication and second degree manslaughter instructions, but argues counsel's failure to develop or emphasize Haddix's intoxication made the instructions meaningless. (*Id.*). Haddix argues that had counsel developed the evidence of his intoxication beyond the mere testimony that Haddix had been drinking beer with the victims and that he had been found lying in the driveway while appearing to be very intoxicated, it is reasonably probable that the jury would have returned a different result.[11]

A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.

Notably here, Haddix does not set forth what additional evidence trial counsel should have presented regarding his intoxication.  Review of the record demonstrates that the jury heard evidence of Haddix's intoxication from several witnesses:  Haddix's sister, Ms. Combs, testified that when

---

[11]Finding this claim fails on its merits, this Court will not address whether Haddix fairly presented to the state courts his ineffective assistance claim based on counsel's failure to investigate and introduce sufficient evidence of his intoxication. *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, to promote judicial economy, a federal court could decide to further entertain an issue which is "easily resolvable" against petitioner, where an issue of procedural default entails more complications) (citing 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies).  Thus, this Court will conduct a *de novo* review of the claim of whether counsel provided ineffective assistance in failing to further develop and present facts of his intoxication. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (explaining that courts may deny habeas relief under § 2254 "by engaging in *de novo* review when it is unclear whether AEDPA deference applies").

she and Haddix were together earlier in the day he had been drinking and was already "pretty full"; Estill Mullins testified that he and Haddix had been drinking for three or four hours prior to the shooting; Haddix testified that he had been drinking "a pretty good while," got "pretty full," and asked Gladys to call his sister to come get him because he did not think he should drive; and an officer testified that when he arrived on the scene, he saw Haddix lying on the ground with beer cans around him.  (R. 7, DVD of trial at 9/27/2006, at 9:38, 1:19:10; 9/28/2006, at 1:09, 1:23).  Thus, the jury heard evidence of Haddix's intoxication, and Haddix has not pointed to any evidence that counsel failed to elicit in this regard.  It is Haddix's burden to establish the elements of his ineffective assistance of counsel claim, *see Richter*, 562 U.S. at 104.  Haddix has failed to meet his burden of establishing counsel's performance was deficient in this regard.[12]

Even if counsel had been deficient in this regard, Haddix has not established a reasonable probability that the result of the proceeding would have been different had additional evidence of his intoxication been presented.  As explained above, the jury heard evidence of Haddix's intoxication and yet unanimously determined he intentionally caused Woodrow's death. (*See* R. 4-3, at 26).  There is nothing in the record to suggest that the results of the proceedings would have been different had the jury heard additional evidence of Haddix's level of intoxication.  Thus, Haddix has not met his burden of establishing counsel was ineffective for failing to marshal and present additional evidence of his intoxication.

---

[12]Moreover, the record demonstrates that counsel's strategy at trial was that Haddix acted in self defense.  Haddix testified that he did not shoot Estill, and he only shot Woodrow after Woodrow came out of the trailer with a loaded shotgun, fired a shot, reloaded it, cocked it and was beginning to lower it while pointing it at Haddix.   Haddix's counsel emphasized during closing arguments that Woodrow had been drinking and had taken Benadryl, which the medical examiner explained can intensify the effects of alcohol and can cause mood swings.  Counsel argued that it was the combination of alcohol and Benadryl that caused Woodrow to become hostile and initiate the confrontation with Haddix.  Counsel's decision to emphasize the facts supporting a claim of self defense was a reasonable strategic decision and did not amount to ineffective assistance.

Haddix also argues that counsel was ineffective in failing to seek an EED instruction, which would have given the jury the opportunity to consider the defense and reduce the degree of homicide from murder to manslaughter.  (R. 8, at 21).  Haddix argues that his testimony provided sufficient evidence of a triggering event to support an EED instruction, and thus counsel's failure to request the instruction constituted deficient performance.

As discussed above, the Kentucky Court of Appeals considered this claim and found that there was no factual basis to support an EED instruction, stating Haddix's testimony of his version of the events was that he remained calm during this altercation.  Review of Haddix's trial testimony confirms the Kentucky court's findings.  Haddix testified that after he and Estill were bickering and Haddix had called Woodrow to the door to bring him into the disagreement, Haddix said "looks like Chief Hoot Owl Feather has wore his welcome out here," and while stroking the feather on his hat, he turned around and twice hooted like an owl.  (R. 7, DVD of trial on 9/28/2006, at 1:27:18 - 1:28:17).  He testified that as he was starting his four-wheeler to leave, he heard a shot, which scared him.  He said he turned and saw Woodrow reloading a shotgun, and he told Woodrow to put the gun down and that he was leaving.  (*Id*. at 1:28:17 - 1:35:09).  Contrary to Haddix's argument, his testimony did not evidence a heated disagreement between him and the victims that created "an emotionally charged scene."  Instead, his testimony established that he joked, made owl sounds, and remained calm while telling Woodrow to put down the shotgun.  (R. 7, DVD of trial on 9/28/06, 1:23 - 1:35).  Defendant has not rebutted by clear and convincing evidence the state court's factual finding that there was no factual basis to support an EED instruction and, in fact, the record supports the state court's findings.  Thus, Haddix has failed to demonstrate that the state court unreasonably applied *Strickland* when it determined counsel's failure to seek an EED instruction was not deficient since the instruction was not supported by the facts.

Haddix also argues that the Kentucky courts erred in their application of *Strickland* when they found his trial counsel was not constitutionally ineffective in failing to seek an instruction for assault in the fourth degree. (R. 8, at 21-22). Haddix argues that because Estill was able to walk out of the emergency room on the night of the incident, his injury was not sufficient to warrant a conviction for assault in the second degree. Haddix further states that counsel was deficient in not investigating evidence to develop the fact that Estill's injury was not serious.

The Kentucky Court of Appeals considered Haddix's argument and found that he had not presented any reason to disturb the circuit court's ruling. (R. 1-6, at 10). Specifically, the Kentucky Court of Appeals stated that Haddix did not present any rationale or argument for why he believed Estill's recovery had any bearing on an appropriate jury instruction, and it affirmed the circuit court's denial of his ineffective assistance of counsel claim in this regard.

In his current Petition, Haddix again references the lack of serious injury to Estill as supporting that the Kentucky courts erred in dismissing his claim of ineffective assistance in failing to develop the lack of serious injury to Estill and in not requesting an assault in the fourth degree instruction. (R. 8, at 21). Under Kentucky law, while serious physical injury is an element of assault in the second degree under certain circumstances, it is not an element when physical injury is intentionally caused by a gun. *See* Ky. Rev. Code (KRS) § 508.020. Instead, as instructed by the circuit court, *see* R. 4-3, at 24, when the jury finds a defendant intentionally caused physical injury to another by means of a deadly weapon, he is guilty of assault in the second degree and a showing of serious physical injury is not required.[13] KRS § 508.020(b). Here, the evidence established, and Haddix does not dispute, that Estill suffered a physical injury. The jury instruction given did not

---

[13]"Deadly weapon" is defined to include a weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged. KRS § 500.080(4).

require a showing of a serious physical injury.  Haddix has not established that the Kentucky courts unreasonably applied *Strickland* in denying his ineffective assistance of counsel claim based on counsel's failure to further develop the lack of serious physical injury to Estill and to seek a jury instruction for the lesser offense.

### 3. Claim that counsel provided ineffective assistance by failing to retain an expert on Haddix's mental health

Haddix argues that the Kentucky courts unreasonably applied *Strickland* when they denied his ineffective assistance of counsel claim based on counsel's failure to retain or consult with a medical expert regarding the discrepancy in conflicting reports regarding his competency to stand trial and before making the decision to withdraw his assertion of the insanity defense.[14]  (R. 1, at 11; R. 8, at 22-24).  Defendant argues that while the report of the Kentucky Corrections Psychiatric Center (KCPC) found him competent, he had a consulting report that was issued in connection with his claim for Social Security benefits that found him "not competent."  (R. 8, at 23).  Thus, Haddix argues that due to the conflicting medical reports, counsel needed the assistance of a medical expert to properly understand, evaluate, and argue the issues surrounding his mental state, and failure to retain such an expert constituted the ineffective assistance of counsel.

The Breathitt Circuit Court denied this claim without a factual analysis, finding no showing of prejudice.  (R. 1-3, at 3). The Kentucky Court of Appeals reviewed whether the Breathitt Circuit

---

[14]Haddix seems to confuse the concepts of competency and insanity and uses the terms interchangeably.  Under Kentucky law, a defendant is incompetent to stand trial if, as a result of a mental condition, he lacks a capacity to appreciate the nature and consequences of the proceedings against him or cannot participate rationally in his own defense.  *See* KRS § 504.060(4).  "Insanity," however, means the defendant, as a result of a mental condition, lacks a substantial capacity either to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of the law.  *See* KRS § 504.060(5).  Haddix arguably raised both issues in his RCr 11.42 Motion, stating counsel was inadequate in investigating Haddix's "prior mental state as well as the present."  (R. 4-8, at 42-43).

Court should have held an evidentiary hearing on this issue, and found that its decision to deny this

claim without an evidentiary hearing was not error, stating:

> Finally, Haddix argues his trial counsel was deficient in failing to retain expert witnesses to testify that he was psychologically unstable at the time of the shootings and therefore not legally culpable.  In support of the argument, he contends the report of the Kentucky Correctional Psychiatric Center (KCPC) finding him competent to stand trial is contradicted by the findings of a Social Security Administration consultative exam.  Haddix's brief does not cite to the portion of the record where a record of the Social Security exam may be found, and our review has not revealed it.

> We believe, however, the record does reveal an absence of merit in Haddix's argument that his trial counsel improperly failed to seek expert testimony that he was mentally incompetent.  First, as the Commonwealth points out, Haddix's trial attorney did initially prepare for a defense of insanity, and filed a notice of his intent to do so.  He later withdrew the notice and abandoned the defense.

> The abandonment of the defense occurred after the KCPC competency report was filed.  That report contains detailed information about Haddix's psychological and physical condition, his personal history, and his intelligence.  It concludes with an opinion that Haddix was competent to stand trial.

> The record was sufficiently complete for the circuit court to evaluate whether, in light of the KCPC report, trial counsel's decision to withdraw the defense was wise, or whether it was reasonably feasible that a competent attorney could demonstrate that Haddix suffered from a "lack of substantial capacity either to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law[.]"  KRS 504.060.  An evidentiary hearing was not required.

(R. 1-6, at 12-13; *see also* R. 4-3, at 3-9).  The Kentucky Court of Appeals affirmed the Breathitt

Circuit Court's denial of this ineffective assistance of counsel claim.

Here, Haddix has not established that the Kentucky courts' denial of this claim was an

unreasonable application of *Strickland*.[15]  As explained above, to establish prejudice Haddix must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

---

[15]The state courts reasonably applied *Strickland*'s prejudice prong, and therefore this Court need not discuss Petitioner's presentation on whether counsel's decision in this regard constitutes deficient performance.

the proceeding would have been different.  The state record before this Court is devoid of any evidence suggesting Haddix was incompetent to stand trial or suffered from a mental defect that would support an insanity defense.  Instead, Haddix merely asserts that counsel should have conferred with an expert before making the decision to withdraw his assertion of an insanity defense, because "he may well have been incompetent." (R. 8, at 24).  Haddix has not, however, presented any evidence of what such a consultation would have revealed; nor does Haddix explain how trial counsel's consultation with a medical expert regarding the differences between the findings of the KCPC evaluator and those of a consulting examiner who rendered an opinion for his Social Security claim would have impacted his trial.[16]  *See Manis,* 2015 WL 2341107, at *3 (no basis for claiming ineffective assistance where no proof that the assistance of a defense psychiatrist would have changed the result of the proceeding).  Instead, Haddix simply argues that he "was prejudiced by the loss of a defense and by being forced to proceed when he **may** well have been incompetent." (R. 8, at 24 (emphasis added)).  This is not sufficient to meet his burden of establishing that a reasonable probability exists that, but for trial counsel's deficient performance in failing to consult with a medical expert on his mental condition at either the time of the offense or the time of trial, the outcome of the trial might have been different.  Thus, Haddix has not established he was prejudiced by counsel's failure to obtain a second psychological evaluation or to consult with a medical expert.

---

[16]Even if Haddix had been found disabled under the Social Security Act as a result of a mental impairment, such evidence, without more, does not equate to a finding that he met the legal definition for insanity or that he was incompetent to stand trial. *See Manis v. Warden, Lebanon Correctional Inst.*, No. 1:14-cv-057, 2015 WL 2341107, at *2 (S.D. Ohio May 14, 2015), *adopted by* 2015 WL 5439018 (S.D. Ohio Aug. 7, 2015) (*citing Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000)).  A determination that a person suffers from a mental impairment sufficient for a finding that he is disabled under the Social Security Act is different from a finding that a defendant's mental state is sufficient to support an insanity defense or that he is incompetent to stand trial in a criminal case. *Id*. at *3.

Without more, the Court cannot conclude that the Kentucky courts' denial of this claim was contrary to or an unreasonable application of *Strickland*.

### 4. Claim that counsel provided ineffective assistance by introducing a 911 call and a police log that was more prejudicial than probative

Haddix argues that the Kentucky courts' denial of his ineffective assistance of counsel claim based on counsel's introduction of evidence that was more prejudicial than probative was an unreasonable application of *Strickland*. (R. 1, at 13; R. 8, at 24-26). Specifically, Haddix argues that counsel was ineffective for introducing a report and communication log of a dispatch transmission to the responding officers. The report and communication log introduced by counsel incorrectly stated that Petitioner had previously threatened to shoot police officers. Counsel then played for the jury a later call reporting the previously provided information was incorrect; it related to a Wilgus Gray Haddix and not Blake Haddix. Petitioner argues that there was no reason for counsel to place this confusing information before the jury as it had no bearing on his case. He argues that Wilgus Gray Haddix is a family member and by needlessly placing this information before the jury, the jury had information on which they could conclude that Petitioner was from "a family of violent outlaws who were not above threatening the police." (R. 8, at 25).

Haddix raised this claim in his RCr 11.42 Motion, which the circuit court summarily denied upon finding Haddix did not suffer prejudice as a result of counsel's alleged conduct. (R. 1-3, at 3). Haddix appealed the circuit court's denial of an evidentiary hearing on the issue. The Kentucky Court of Appeals affirmed, finding the record was sufficient for the trial court to determine whether counsel was deficient in this regard and whether Haddix was prejudiced by the conduct. Thus, the Kentucky Court of Appeals found that an evidentiary hearing was not necessary. (R. 1-6, at 4-5).

Haddix has not met his burden of establishing that the Kentucky court's finding with respect to the prejudice prong was an unreasonable application of *Strickland*. The fact the state court did not articulate its reasoning does not change this Court's review. *See Richter*, 562 U.S. at 102. "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.*; *Johnson v. Williams*, ___ U.S. ___, 133 S. Ct. 1088, 1101 (2013) (Scalia, J., concurring) ("what is accorded deference is not the state court's reasoning but the state court's judgment, which is presumed to be supported by whatever valid support was available") (*citing Richter*, 562 U.S. at 102-03); *Payne v. Warden, Lebanon Corr. Inst.*, 543 F. App'x 485, 490 (6th Cir. 2013) (finding evidence not cited by state court supported state court's finding that petitioner was not prejudiced by counsel's errors) (*citing Richter*, 562 U.S. at 102-03).

Here, even assuming counsel's conduct in this regard was deficient, it was reasonable for the Kentucky court to find Haddix had not established that he was prejudiced by this conduct. In other words, he had not shown there was a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. First, counsel was able to clarify for the jury that the original report to the responding officers of Petitioner making threats to police in the past was in error, and that it was not Petitioner who had previously threatened officers, but a Wilgus Gray Haddix. Petitioner argues, though, that the corrected information was also prejudicial because Wilgus Haddix is related to Petitioner and thus the jury could think he came from a "family of violent outlaws." He does not, however, provide record citation to where the jury was told Wilgus Gray Haddix was related to him, nor does the Court's review of the record reveal any such testimony or argument.

Moreover, other evidence of record supports the state court's conclusion that Petitioner did not suffer prejudice from this conduct.  The only surviving witnesses from the incident were Petitioner, Estill and Gladys.  All three agreed that at the time of the shooting, only four people were at the trailer:  Petitioner, Estill, Gladys and Woodrow.  Both Estill and Gladys testified that the first gunshot heard that evening was the shot that injured Estill when the bullet grazed his head as he was closing the door for the evening.  In addition, they testified that when Estill was closing the door, Petitioner was outside the trailer and Gladys, Estill and Woodrow were all inside the trailer.  The last place Gladys saw Woodrow alive was when he was standing beside his bed after Estill was shot.  In addition, both Gladys and Estill testified that the window in their door did not have a bullet hole in it before that evening, but it did after Estill was shot.  Petitioner's version of events was that the first gunshot was from Woodrow shooting his shotgun at Petitioner while standing on the porch and that he only shot Woodrow in self defense.  But the verdict demonstrates that the jury did not find Petitioner's testimony to be credible.  Petitioner has not demonstrated that there existed a reasonable probability the result of the trial would have been different had counsel not introduced the report, communication log and subsequent call.  In light of the strong evidence against Petitioner, the state court's determination that Petitioner did not suffer prejudice as a result of counsel's conduct in this regard was not an unreasonable application of *Strickland*.

> **5.    Claim that counsel provided ineffective assistance by failing to object to the erroneous comment of the prosecutor that the victim was shot from behind**

Haddix argues that the Kentucky courts unreasonably applied *Strickland* in finding that he did not suffer prejudice as a result of his counsel's failure to object to the prosecutor's erroneous comment that Woodrow was shot from behind.  (R. 1, at 14; R. 8, at 26-28).  Haddix first raised this issue in his RCr 11.42 Motion, which the circuit court summarily denied without an evidentiary

hearing, finding Haddix did not suffer prejudice as a result of counsel's conduct.  (R. 1-3, at 3).
Haddix appealed the circuit court's decision to deny this claim without conducting an evidentiary
hearing, and the Kentucky Court of Appeals affirmed.

Here, Haddix argues the Kentucky court erroneously found he was not prejudiced by his
counsel's failure to object to the prosecution's erroneous statement.  He argues that because the
misstatement was made in closing argument, at a time when Haddix could not rebut the statement,
the prejudice he suffered was amplified.  Haddix argues that the prosecutor's misstatement destroyed
his self-protection defense because without an objection, the jury would have believed Woodrow was
shot in the back. (R. 8, at 28).

Assuming for purposes of review that the prosecutor erroneously stated during closing
argument that Woodrow was shot in the back, the Kentucky court did not unreasonably apply
*Strickland* in finding counsel's failure to object did not prejudice Haddix.[17]  During his closing
argument, the prosecutor emphasized at least twice that Woodrow was shot once in his side and once
in his neck.  (R. 7, DVD of trial, on 9/29/06, at 11:41:15 - 11:45; 12:09 - 12:10:15).  In fact, the
prosecutor explained the medical examiner's findings in detail, including where the shots entered
Woodrow's body and the angles that the bullets traveled.  (*Id*. at 11:41:15 - 11:45).  Even if the
prosecutor erroneously stated that Woodrow was shot from behind, this isolated statement was
corrected at least twice during the prosecutor's closing argument.  Review of the entire trial
demonstrates Haddix failed to establish there was a reasonable probability that the outcome of the
trial would have been different but for counsel's failure to object to the prosecution's misstatement

---

[17]The Court's review of the record did not reveal this alleged statement by the prosecutor.  Instead,
the prosecutor explained during closing argument that the victim had been shot in the neck and in his side.
(R. 7, DVD of trial, on 9/29/06, at 11:40).  However, for purposes of this review, the Court will assume that
such a statement was made at some point in the closing argument.

that Woodrow was shot from behind.  Thus, the Kentucky court's finding that Haddix suffered no prejudice from counsel's failure to object to this isolated misstatement is a reasonable application of *Strickland* given the evidence and argument presented at trial.  The prosecutor corrected any misstatement by discussing the medical examiner's report in detail during his closing, which correctly identified where the bullets entered Woodrow's body.  *See Wallace v. Sexton*, 570 F. App'x 443, 456-57 (6th Cir. 2014) (state court did not unreasonably apply *Strickland* in denying petitioner's claim that counsel failed to object to prosecutor's improper statements during closing; fairminded jurists could conclude different trial outcome not reasonably probable even had counsel objected because strong evidence was presented that undermined the defense theory).

### 6.     Claim that counsel provided ineffective assistance by failing to seek a change of venue or to have the jury sequestered

Haddix argues the Kentucky court unreasonably applied *Strickland* when it held he was not prejudiced by trial counsel's failure to move for a change of venue or to have the jury sequestered during his high profile trial.  (R. 1, at 14; R. 8, at 28-31).  Haddix notes that Breathitt County is a small, close-knit community with a population of approximately 13,545 people and that this case was the talk of the county, with reports "appearing in all the local media and social media outlets." (R. 8, at 28-29).  Haddix argues that a neutral unbiased jury could therefore not be found in Breathitt County.  He further argues that because counsel failed to seek to sequester the jury, each day during the four-day trial the jury returned to a community saturated with information about the case. According to Petitioner, under these circumstances, counsel's failure to seek a change in venue or to sequester the jury constituted the ineffective assistance of counsel.

Haddix raised this claim in his RCr 11.42 Motion.  (R. 4-8, at 39-40).  The circuit court denied the claim, finding Petitioner was not prejudiced by counsel's conduct.  (R. 1-3, at 3).  The

Kentucky Court of Appeals considered whether the circuit court erred in rendering its decision
without an evidentiary hearing, stating:

> We first address Haddix's argument that his trial counsel was deficient in failing to
> obtain a change of venue or sequestration of the jury. Our review of the record
> reveals, however, that the trial judge and the trial attorneys for both Haddix and the
> Commonwealth engaged in extensive voir dire to ascertain whether the jurors had a
> connection to any of the parties, witnesses, or the attorneys involved in the case. The
> trial court furthermore inquired regularly of the jurors whether they had discussed the
> trial with anyone or encountered any news of the trial. These thorough and routine
> inquiries created a significant record from which the circuit judge could conclusively
> determine whether Haddix's trial attorney performed inadequately by failing to
> change the venue or have the jurors sequestered. There was no need for a hearing on
> this matter.

(R. 1-6, at 6-7). The Kentucky Court of Appeals affirmed the Circuit Court's decision on this issue.
(*Id*. at 14).

The Supreme Court has held that a court should grant a change of venue if a defendant cannot
receive a fair trial due to prejudicial pretrial publicity and local bias against him. *Sheppard v.
Maxwell*, 384 U.S. 333, 362-63 (1966); *Irvin v. Dowd*, 366 U.S. 717, 722-24 (1961); *see also
Campbell v. Bradshaw*, 674 F.3d 578, 593 (6th Cir. 2012). Prejudice resulting from pretrial publicity
can be either presumptive or actual. *Campbell*, 674 F.3d at 593 (*citing Foley v. Parker*, 488 F.3d
377, 387 (6th Cir. 2007)). "'Presumptive prejudice from pretrial publicity occurs where an
inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community'
and 'is rarely presumed.'" *Id*. Where presumptive prejudice is absent, the trial court should
determine if the publicity rises to the level of "actual prejudice." *Id.* (*citing Ritchie v. Rogers*, 313
F.3d 948, 962 (6th Cir. 2002)).

The Sixth Circuit explained the process for determining actual prejudice:

> "[S]earching voir dire of the prospective jurors is the primary tool to determine if the
> impact of the publicity rises to th[e] level" of actual prejudice. [*Ritchie*, 313 F.3d at
> 962]. At voir dire, the court must examine the jurors' statements to determine if

there is a community-wide sentiment against the defendant; however, "[n]egative media coverage by itself is insufficient to establish actual prejudice." *Foley*, 488 F.3d at 387. When evaluating jurors, "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint. . . ." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). Rather, "[t]he relevant question is 'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Foley*, 488 F.3d at 387 (second alteration in original) (*quoting Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). If a biased juror was seated who should have been dismissed for cause, we must reverse the conviction. *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001).

*Campbell*, 674 F.3d 593-94.

Here, Haddix argues that counsel should have moved for a change of venue because both the victims' family and his family were well known in the community, and the case was the talk of the county. Haddix provides no specific information for his claim that he was the subject of prejudicial news coverage, but argues the fact numerous jurors were excused for cause because they already knew of the incident, knew Haddix, his family, or the victims and their family demonstrates why this case should have been transferred to a different venue.

As in *Campbell*, Haddix has not met his burden of establishing that the Kentucky court unreasonably applied *Strickland* in finding he did not suffer prejudice from counsel's failure to seek a change of venue. Haddix has not demonstrated sufficient facts to support a finding of presumptive prejudice, as there was no evidence of a circus-like atmosphere surrounding the courthouse or the community. Nor has Haddix demonstrated actual prejudice.

Review of the voir dire in this case reveals that the trial court and counsel both extensively questioned the jury pool regarding their knowledge of the case. The jury pool was asked whether any of them: knew anything about the facts of this case; had heard anything about this case; talked to anyone about the case; read any newspaper articles or listened to any radio or television broadcasts

discussing the case.  (R. 7, DVD of trial on 9/26/06, at 10:56:34 - 10:58; 12:03:06 - 12:04:22; 12:28:03 - 12:30:18).  Those potential jurors who had some knowledge of the case were called to the bench, and they discussed their responses with the court and counsel outside of the hearing of the rest of the jury pool.  The potential jurors whom the court found were at issue for being unable to render a fair and impartial verdict were excused.  The jury pool was also asked if anyone lived within a five mile radius of where the shooting occurred.  None of the members seated on the jury answered affirmatively.  (*Id*. at 12:00:18 - 12:00:39).  Further, the jury members were asked multiple times and in different ways whether there was any reason they could not listen to the evidence and render a fair and impartial verdict based only on the evidence presented in court.  (*Id*. at 11:01:18 - 12:39:40).  All members selected for the jury indicated they could render a fair and impartial verdict based only on the evidence that would be presented in court.  (*Id*.).

Notably, Haddix has not pointed to any particular juror that he asserts was seated on the jury who he has some reason to believe had prior knowledge of the facts of the case, knew one of the participants, or who otherwise had already formed an impression or opinion about the case.[18] Moreover, merely having prior information about a case or some impression as to the merits does not automatically exclude a person from serving on a jury.  *See Irvin*, 366 U.S. at 722-23.  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id*.  Haddix has not identified any juror who was seated on the jury who he believes could not be fair and impartial.  Further, the Court's review of voir dire did not reveal a community-wide sentiment against Haddix.

---

[18]To the extent Petitioner's prior arguments can be read to assert a claim that J.S. harbored such bias, her testimony at the evidentiary hearing dispels such a finding.  Specifically, she testified that she had no specific knowledge of the facts of the case.  In addition, as discussed in more detail above, she did not know until after the trial that her brother-in-law may have been related to one of the victims.

As Haddix has failed to demonstrate either presumptive or actual prejudice that would have required a change of venue, he has not demonstrated that his counsel's failure to seek a change of venue caused him to suffer prejudice, as required under *Strickland* to prevail on his ineffective assistance of counsel claim. *See Campbell*, 674 F.3d at 594 (finding state court did not unreasonably apply *Strickland* in finding no showing of prejudice stemming from counsel's failure to move for change of venue where petitioner failed to demonstrate presumptive or actual prejudice caused by pretrial publicity). Thus, the Kentucky court had a reasonable basis for finding that Haddix was not prejudiced by counsel's failure to seek a change of venue, and its decision was not an unreasonable application of *Strickland*.

Similarly, Haddix has not established that the Kentucky court's finding he did not suffer prejudice from counsel's failure to move to have the jury sequestered was an unreasonable application of *Strickland*. Haddix argues that because counsel did not seek to have the jury sequestered during trial, at the end of each day of the four-day trial the jury returned to a community that was saturated with information about the case. Petitioner does not point to any evidence, or even allege, that any of the jurors were actually exposed to information about the case while the trial was adjourned in progress. Further, every morning the judge questioned the jury as to whether, while on the evening break, they had heard anyone discussing the case, heard any broadcasts regarding the case, seen any newspaper articles about the case, discussed the case with anyone, or whether anyone had approached them to discuss the case.[19] The record does not reflect that any juror

---

[19]Further, the record reflects that on the third day of trial, the court cleared the courtroom, called each juror in, one by one, and questioned him/her as to whether anyone had tried to contact him/her by telephone or approached him/her about the case either before or after the start of trial. Each juror stated, under oath, that no one, either before or after the trial started, had contacted or attempted to contact him/her, in person or by telephone, to discuss any issues involved in the case. (R. 7, DVD of trial on 9/28/06, at 11:06 - 11:27). All jurors also stated they had not yet discussed the case among the juror panel. (*Id.*). While the record is not clear as to the reason for this inquiry, the jurors' responses are further evidence that a reasonable basis

44

gave a positive response to the judge's questioning.  In addition, after each recess, the judge asked the jurors whether they had heard anyone discussing the case, if anyone had approached them during the recess about the case, or if they had discussed the case with anyone, including other jurors. Again, the record does not reflect that any juror gave a positive response.  Based on these facts, the state court had a reasonable basis for finding Haddix did not suffer prejudice as a result of counsel's failure to move to have the jury sequestered during trial, and thus it did not unreasonably apply *Strickland*.

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.  A certificate may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In cases where a district court has rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*.  "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

---

existed for the Kentucky court to find Haddix was not prejudiced by counsel's failure to seek to have the jury sequestered.

In this case, reasonable jurists would not debate the denial of Haddix's § 2254 Petition or conclude that the issues presented are adequate to deserve encouragement to proceed further.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack*, 529 U.S. at 484).  Accordingly, it will be recommended that a certificate of appealability be **denied** upon the District Court's entry of its final order in this matter.

## IV.    CONCLUSION AND RECOMMENDATION

For the reasons stated herein, **IT IS RECOMMENDED** that:

(1)    the Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (R. 1), **be denied** and this matter **be dismissed**;

(2)    a Certificate of Appealability **be denied** by the District Court in conjunction with the Court's entry of its final order in this matter;

(3)    Judgment in favor of the Respondent **be entered** contemporaneously with the District Court's entry of its final order; and,

(4)    this case **be stricken** from the active docket of this Court.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute.  *See also* Rules Governing Section 2254 Proceedings for the United States District Courts, Rule 8(b).  Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court.  Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals.  *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Walters,* 638 F.2d 947, 950 (6th Cir. 1981).

Dated this 29th day of October, 2015.



**Signed By:**

***Candace J. Smith***

**United States Magistrate Judge**

I:\DATA\habeas petitions\2254 General\15-31 Haddix R&R final.wpd